Argued and submitted January 5, 2012, on petition, affirmed; on cross-petition, award of attorney fees against Jenkins and on behalf of Adair reversed; otherwise affirmed June 5, 2013

SAIF CORPORATION
and Employment Source, Inc.,
*Petitioners*
*Cross-Respondents,*

*v.*

MATT JENKINS CONTRACTING,
*Respondent*
*Cross-Petitioner,*

*and*

DEPARTMENT OF CONSUMER
AND BUSINESS SERVICES,
and Sedgwick Claims Management Services,
*Respondents*
*Cross-Respondents,*

*and*

Daniel R. ADAIR,
*Cross-Respondent.*

Workers' Compensation Board
0800001NC; A144429

306 P3d 641

Julie Masters argued the cause for petitioners-cross-respondents. On the briefs was Julene M. Quinn.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent-cross-respondent Department of Consumer and Business Services. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Michael G. Bostwick argued the cause and filed the brief for respondent-cross-respondent Sedgwick Claims Management Services.

Philip Emerson filed the brief for respondent-cross-petitioner.

No appearance for cross-respondent Daniel R. Adair.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Edmonds, Senior Judge.

EDMONDS, S. J.

Sercombe, J., concurring in part, dissenting in part.

## EDMONDS, S. J.

This case involves the interpretation of ORS 656.850, a statute that governs the responsibility of worker leasing companies (WLCs) to provide workers' compensation insurance coverage for the WLCs' leased workers and the other subject workers of the WLCs' clients. SAIF Corporation (SAIF) and Employment Source, Inc. (ESI) seeks judicial review after an administrative law judge (ALJ) ruled that SAIF's insured, (ESI), had provided a leased worker to Matt Jenkins Contracting (Jenkins) on October 1, 2007, and was, therefore, responsible for providing workers' compensation coverage for all of Jenkins's subject workers, including one who was seriously injured on October 10, 2007. Jenkins cross-petitions for review and argues that the ALJ erred with respect to rulings regarding claims for attorney fees. On the petition for review, we affirm; on Jenkins's cross-petition, we affirm in part and reverse in part.

The factual background for this case is as follows: ESI is a temporary service provider in the Bend area, dispatching temporary workers to other businesses for a fee. Although ESI maintains a worker leasing license under ORS 656.850(2), it is not a worker leasing business and has always "considered itself to simply be a temporary service provider under ORS 656.850(1)(c)." The distinction between a WLC and a temporary service provider is important to this case.[1] When acting as a temporary service provider, ESI is exempt from the responsibilities that ORS 656.850 imposes on WLC. In providing a temporary worker to a client, ESI customarily dispatches the worker with a "work order" specifying the worker's assignment, the worker's rate of pay, and the dates on which the temporary employment will begin and end. Where the duration of the temporary employment is unknown, ESI notes an "approximate end date" of its own choosing, generally not more than 90 days beyond the start date. The worker reports to the client but submits weekly time cards to, and is paid by, ESI, which then bills the client.

---

[1] *DCBS v. Zurich American*, 246 Or App 702, 268 P3d 671 (2011), *modified on recons*, 249 Or App 547, 283 P3d 357, *rev den*, 353 Or 103 (2012), contains an extended discussion of the obligations that ORS 656.850 imposes on WLCs and of the relationship between WLCs and their clients.

Jenkins is a general contractor and has used ESI's services since 2004 to obtain temporary construction workers.[2] In 2007, Jenkins began construction of a large house located on Silver Fox Drive in LaPine (the Silver Fox house). Jenkins primarily used subcontractors to complete the work; however, when it came time to paint the house, in August 2007 Jenkins concluded that all of the subcontractors' bids were too costly and instead hired an individual worker, Blood, to paint the interior and exterior of the house. Blood had previously worked through ESI, but never for Jenkins. However, he was hired directly by Jenkins in August 2007 on an hourly basis without any initial involvement or knowledge on ESI's part. Jenkins then hired another worker, Adair, to paint the house along with Blood. Adair, a more experienced painter, was likewise hired on an hourly basis and without any involvement or knowledge by ESI. Adair kept track of both workers' hours and submitted them either to Jenkins or to Jenkins's wife. Jenkins paid the workers by check approximately every two weeks. Jenkins did not procure workers' compensation coverage for either worker.

On October 10, 2007, Adair sustained multiple serious injuries as a result of a fall from a ladder while painting the Silver Fox house. Shortly after that incident, Blood approached ESI on October 19 regarding his work for Jenkins on the Silver Fox house. Adair had never worked through ESI, ESI had no knowledge of Adair's employment with Jenkins or the injury, and, before October 19, ESI likewise had no knowledge of Blood's work for Jenkins. Blood presented ESI with records reflecting the hours that he had worked for Jenkins from October 1 through October 19, for which he apparently had not yet been paid, and ESI immediately created a work order dispatching Blood to work for Jenkins as a "painter." The work order contained a retroactive "Start Date" of October 1, 2007, a "Disp[atch] Date" of October 19, 2007, and an "End Date" of February 23, 2008. ESI then paid Blood for his work on the Silver Fox home dating back to October 1, and Blood continued to work for Jenkins through ESI for several months. The "Start Date" of

---

[2] Prior to the events at issue in this case, ESI had last supplied Jenkins with temporary workers in June 2007.

October 1 and ESI's payment of Blood's wages would become key facts with respect to the events that followed.

Following Adair's injury, the Department of Consumer and Business Services (DCBS) conducted an investigation and issued a proposed order declaring that Jenkins was a noncomplying employer (the NCE Order). DCBS assessed a $7,940 civil penalty against Jenkins in light of his failure to insure Adair against workplace injury. DCBS appointed Sedgwick Claims Management Services (Sedgwick), its processing agent, to process Adair's injury claim under ORS 656.054(1), and Sedgwick accepted Adair's claim as work-related.

Jenkins then requested a hearing to contest the NCE Order and penalty. At the hearing, he advanced two arguments: first, that he had not employed any subject workers during the period of time at issue, and, alternatively, that ESI was responsible under ORS 656.850(3) for coverage of Adair's injury as a result of its actions regarding Blood on October 19. In light of the latter argument, ESI and SAIF, along with DCBS and Sedgwick, were joined as parties to the litigation and appeared at the hearing on the NCE Order. At the hearing, DCBS, Sedgwick, and Jenkins argued that ESI became responsible for providing workers' compensation coverage for Adair's injury as a subject worker pursuant to ORS 656.850. In their view, Blood became a leased worker under the statute as of October 1 by operation of law because Blood did not qualify as a temporary worker in the absence of any documentation of temporary worker status by ESI for Blood as of October 10, the date of Adair's injury. ESI and SAIF countered that Blood did not become a worker for Jenkins until October 19, the date that he was dispatched by ESI to Jenkins. According to them, the documentation that existed as of that date sufficed to classify Blood as a temporary worker, thereby relieving ESI of the responsibility to provide coverage under the statute for Adair on October 10.

The ALJ ultimately issued an opinion and order, finding first that Adair had been a subject worker. The ALJ, therefore, upheld the NCE Order against Jenkins.

Addressing the alternative argument made by Jenkins, DCBS, and Sedgwick regarding ESI's alleged responsibility for Adair's injury claim, the ALJ reasoned:

"ESI provided Mr. Blood to Mr. Jenkins as a leased worker rather than as a temporary worker from the starting date of that arrangement, on October 1, 2007, until ESI's contemporaneous documentation that Mr. Blood was a temporary worker first arguably existed on October 19, 2007. Because that documentation did not exist when Mr. Adair was injured on October 10, 2007, ESI was a worker leasing company then and was responsible under ORS 656.850(3) to provide workers['] compensation coverage for both Mr. Blood and Mr. Jenkins' subject employee, Mr. Adair. Although ESI's documentation on October 19, 2007, might have converted Mr. Blood to a temporary worker then, extinguishing ESI's duty to provide coverage thereafter to Mr. Adair, ESI was responsible for Mr. Adair's coverage on October 10, 2007.

"ESI/SAIF argues that the use of the term 'provides' in the present tense in ORS 656.850(3) precluded ESI from *retroactively providing* Mr. Blood as a worker for Mr. Jenkins prior to ESI's dispatch on October 19, 2007. This argument is not persuasive. The term 'provides' in that section does not convey an intention that an employer may not do so."

(Emphasis added.) In addition, the ALJ awarded Adair an assessed attorney fee of $6,000, to be paid by Jenkins pursuant to ORS 656.382(2). Specifically, the ALJ ruled:

"Here, Mr. Jenkins requested a hearing to challenge the WCD's NCE Order concluding that Mr. Jenkins was a subject employer who had employed subject workers, including Mr. Adair, without workers' compensation insurance coverage. Given the finding here that the NCE Order should be affirmed, Mr. Adair is entitled to an assessed attorney fee from Mr. Jenkins under ORS 656.382(2)."

Finally, after concluding that ESI was "responsible for coverage at the time of Mr. Adair's injury[,]" the ALJ denied Jenkins's request for an award of attorney fees to be paid by SAIF under ORS 656.740(6)(b), reasoning that

"[t]hat section allows an assessed attorney fee where a person who the director found to be a noncomplying employer

had a workers' compensation insurance contract with an insurer that either failed to timely file the contract with the director pursuant to ORS 656.419 or improperly canceled the coverage. Here, Mr. Jenkins did not have a contract with ESI/SAIF to provide workers' compensation insurance coverage to Mr. Jenkins. Rather, ESI/SAIF became responsible for such coverage for leased and subject workers by operation of law under ORS 656.850 and OAR 436-050-0420 [(11/28/07)] due to the worker leasing contract for Mr. Blood. Accordingly, Mr. Jenkins' request for an assessed attorney fee should be denied."

On judicial review, SAIF argues that, when a worker is dispatched by a WLC to a client, the date that the worker is "provided" under ORS 656.850 and OAR 436-050-0420 (6/1/07)[3] is the date that the worker actually is dispatched to begin work and not the date on which the WLC purports to assume responsibility for the worker. Accordingly, under SAIF's interpretation of the statute and the rule, ESI had no responsibility to provide workers' compensation coverage for Adair until Blood was dispatched on October 19, 2007, even though ESI's work order contained an earlier "Start Date" of October 1, 2007. It follows, according to SAIF, that ESI was not statutorily responsible for providing coverage on October 10, 2007, the date of Adair's injury.

In response to SAIF's petition for judicial review, Jenkins does not contest the ALJ's ruling regarding the NCE Order; rather, he relies solely on his alternative argument made below—that ESI provided Blood to Jenkins on October 1 without proper "contemporaneous written documentation" under OAR 436-050-0420 and was therefore a WLC responsible for insuring each of Jenkins's subject workers as of that date pursuant to ORS 656.850(3). DCBS and Sedgwick each advance the same basic argument as Jenkins, albeit with slight variations.

The threshold issue is whether ESI's obligation under ORS 656.850 to provide workers' compensation coverage for leased and subject employees began on October 19, the date that Blood was actually dispatched by ESI to Jenkins, or on

---

[3] OAR 436-050-0420 was amended effective January 1, 2013. We cite the version of the rule that was effective at the time of the events that gave rise to this case.

October 1 (the "Start Date" pursuant to ESI's work order). That issue presents a question of statutory interpretation regarding the regulatory scope of ORS 656.850. In other words, the issue is whether the legislature intended the regulatory provisions of ORS 656.850 to govern the terms of leasing arrangements between WLC and their clients so as to prohibit a WLC from assuming the responsibility to provide workers' compensation coverage for leased and subject workers for a time period that precedes when a leased worker is actually dispatched to a client. To discern the legislature's intent, we examine the text of the pertinent statute, its context, and any helpful legislative history. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). We read the statute in a manner that will give effect to each provision in it. *See Force v. Dept. of Rev.*, 350 Or 179, 190, 350 P3d 179 (2011).

ORS 656.850 provides:

"(1)  As used in this section and ORS 656.018, 656.403, 656.855 and 737.270:

"(a)  'Worker leasing company' means a person who provides workers, by contract and for a fee, to work for a client but does not include a person who provides workers to a client on a temporary basis.

"(b)  'Temporary basis' means providing workers to a client for special situations such as to cover employee absences, employee leaves, professional skill shortages, seasonal workloads and special assignments and projects with the expectation that the position or positions will be terminated upon completion of the special situation. Workers also are provided on a temporary basis if they are provided as probationary new hires with a reasonable expectation of transitioning to permanent employment with the client and the client uses a preestablished probationary period in its overall employment selection program.

"(c)  'Temporary service provider' means a person who provides workers, by contract and for a fee, to a client on a temporary basis.

"(2)  No person shall perform services as a worker leasing company in this state without first having obtained a license therefore from the Director of the Department of

Consumer and Business Services. No person required by this section to obtain a license shall fail to comply with this section or ORS 656.855, or any rule adopted pursuant thereto.

"(3)   When a worker leasing company provides workers to a client, the worker leasing company shall satisfy the requirements of ORS 656.017 and 656.407 and provide workers' compensation coverage for those workers and any subject workers employed by the client unless during the term of the lease arrangement the client has proof of coverage on file with the director that extends coverage to subject workers employed by the client and any workers leased by the client. If the client allows the coverage to expire and continues to employ subject workers or has leased workers, the client shall be considered a noncomplying employer unless the worker leasing company has complied with subsection (5) of this section.

"(4)   When a worker leasing company provides workers for a client, the worker leasing company shall assure that the client provides adequate training, supervision and instruction for those workers to meet the requirements of ORS chapter 654.

"(5)   When a worker leasing company provides subject workers to work for a client and also provides workers' compensation coverage for those workers, the worker leasing company shall notify the director in writing. The notification shall be given in such manner as the director may prescribe. A worker leasing company may terminate its obligation to provide workers' compensation coverage for workers provided to a client by giving to the client and the director written notice of the termination. A notice of termination shall state the effective date and hour of the termination, but the termination shall be effective not less than 30 days after the notice is received by the director. * * *"

We begin our analysis with the definitions provided by the legislature in ORS 656.850(1). A "'[w]orker leasing company' means a person who provides workers, by *contract* and for a fee, to work for a client[.]" (Emphasis added.) When the definition of a WLC in ORS 656.850(1) is inserted into ORS 656.850(3), that subsection of the statute reads, in part:

"When a worker leasing company-[-that is, *a person who provides workers by contract and for a fee to work for a client-*]-provides workers to a client, the worker leasing company shall satisfy the requirements of ORS 656.017 and 656.407 and provide workers' compensation coverage for those workers and any subject workers employed by the client unless during the term of the lease arrangement the client has proof of coverage on file with the director that extends coverage to subject workers employed by the client and any workers leased by the client."

Thus, the text of the statute demonstrates that the legislature contemplated that the terms of leasing arrangements between WLCs and their clients would operate in conjunction with the regulatory provisions of the statute. That observation necessarily means that the legislature intended that the statute would not regulate or govern every leasing arrangement term. Rather, the statute's regulation focuses only on workers' compensation coverage responsibilities. Thus, a term of a leasing arrangement is only within the regulatory scope of the statute if it infringes on a WLC's responsibilities under the statute. Otherwise, any other term would be outside of the statute's regulatory scope.

The next word in ORS 656.850(3) that is salient to our analysis is the word "provides." In context, the word "provides" in ORS 656.850 has its ordinary meaning of to "furnish" or "supply" a leased worker. *Webster's Third New Int'l Dictionary* 1827 (unabridged ed 2002) (capitalization omitted). The word "provides" is used in the statute in a general sense without any express temporal connotations. A worker is "furnished" or "supplied" to a client under circumstances where a worker is made "available" by the WLC to the client for the client's use. At least, that is a reasonable interpretation of the word "provides." It does not follow from that meaning that a worker must actually begin work for the client or be paid by the WLC on behalf of the client at the time that the worker is provided. Rather, those provisions of the WLC and client's leasing arrangement (provisions that may contain temporal characteristics) are part of the terms of the leasing agreement. In any event, regardless of the terms of the arrangement between the parties, the statute places

certain responsibilities on the WLC under circumstances where a leased worker is provided, furnished, supplied, or otherwise made available to the client.

Implicitly, however, the word "provides" operates to define the scope of the statute's regulation. A WLC could not comply with the statute by affording workers' compensation coverage to leased and subject workers *after* a leased worker is "provided" to the client. But those facts are not the facts of this case. Moreover, the meaning of the word "provides" does not prohibit a WLC from assuming responsibility under the statute at an earlier date than when the leased worker reports for work. Indeed, in the interest of prudence, a client may desire to ensure compliance with the statute when the actual date that the leased worker begins work is uncertain.

In addition to the text of ORS 656.850(3), there are further implications from the other provisions of ORS 656.850 that the legislature did not intend to restrict the time period during which a WLC could contractually assume responsibility for a worker so long as there is coverage in place when the leased worker begins work for the client. ORS 656.850(3) includes an exemption from responsibility under the statute when "during the term of the lease arrangement the client has proof of coverage on file with the director that extends coverage to subject workers employed by the client and any workers leased by the client." ORS 656.850(5) provides that "[a] worker leasing company may terminate its obligation to provide workers' compensation coverage for workers provided to a client by giving to the client and the director written notice of the termination." Those provisions authorize a WLC to satisfy the objective of the statute by certifying that leased and subject workers are covered by the client's workers' compensation carrier or by the client's self-insured status. Their implication is that the parties to a leasing arrangement under the statute are at liberty to contract to provide coverage in whatever manner they desire, so long as leased and subject workers are protected by workers' compensation insurance while a leased worker is working for a client.

We turn to the legislative history underlying ORS 656.850 for further insight. House Bill (HB) 2282, which, in part, became ORS 656.850, was enacted by the legislature in 1993. Or Laws 1993, ch 628, § 2. According to the testimony of Gary Weeks, Director of the Department of Insurance and Finance, there were nationally about 1,200 leasing companies leasing over one million employees to businesses that predominately operated without state or federal regulations. When some of those leasing companies collapsed, they left unpaid medical liabilities of workers who had suffered work-related injuries. According to Weeks, the purpose of HB 2282 was "to assure that lease companies that operate in Oregon are not permitted to abuse the workers' compensation system by letting small employers with bad ratings go into them and escape their fair share of the workers' compensation system." Tape Recording, House Committee on Commerce, Subcommittee on Labor, HB 2282, May 25, 1993, Tapes 121, Side A (statement of Gary Weeks). Indeed, as John Butten, Ombudsman for Small Businesses at the Department of Insurance and Finance, pointed out, "[i]n the leasing industry, in many cases, the client hires and channels the worker through the leasing company back to the work place." *Id.* (statement of John Butten).

In light of the text, context, and underlying legislative history of ORS 656.850, we draw the following conclusions regarding the legislature's intent. The overarching legislative purpose of ORS 656.850 is to ensure that either the WLC or the client is legally responsible for providing workers' compensation insurance coverage for leased and subject workers at all times when the leased worker is working for the client. The regulatory scope of the statute focuses on circumstances where a worker is furnished or supplied to the client. When a WLC makes a worker available for the client's use, it acquires responsibilities under the statute. Moreover, nothing in our survey of the text or context of ORS 656.850 or its underlying legislative history suggests that the legislature intended to prohibit a WLC from voluntarily assuming its responsibilities under the statute as of a date that precedes the date that the worker actually reports for work. In other words, the statute's regulatory

scope encompasses circumstances where a WLC supplies a worker to a client with a retroactive start date.

A WLC—that is, "a person who provides workers, by contract and for a fee," ORS 656.850(1)(a)—is responsible for providing workers' compensation coverage for leased workers along with any subject workers employed by the client unless, during the term of the lease arrangement, "the client has proof of coverage on file with the director that extends coverage to subject workers employed by the client and any workers leased by the client." ORS 656.850(3). However, a person "who provides workers to a client on a temporary basis" is excluded from the definition of a WLC and is, therefore, not subject to the requirements of ORS 656.850(3). Pursuant to OAR 436-050-0420(1),

> "[a] person who provides a worker to work for a client will be considered to be providing the worker on a 'temporary basis' only if there is contemporaneous written documentation, retained by either the client or the temporary service provider, which indicates the duration of the work to be performed and the worker is provided pursuant to ORS 656.850(1)(b) under [certain conditions.]"

Thus, by providing appropriate "contemporaneous written documentation" that a worker is temporary, a company can avoid being considered a WLC for purposes of ORS 656.850.

Although ESI's work order on October 19 might have converted Blood to a temporary worker as of October 19, that documentation did not exist on October 10 when Adair was injured. The evident purpose of OAR 436-050-0420 is to place the burden on WLCs to document their election to treat workers as temporary workers rather than as leased workers. Until that documentation exists, a worker may not be considered temporary for purposes of the rule. In other words, given the rule's requirement of "contemporaneous written documentation," Blood may only be considered a temporary worker beginning October 19, 2007—the time the documentation was created. However, from October 1 until October 19, although ESI elected to "provide" Blood for that time period, there was no documentation of Blood's status as a temporary worker. As noted, the ALJ in this case concluded that because there was no contemporaneous

written documentation in existence on October 10, 2007, that would satisfy the requirements of the rule, ESI was responsible to provide coverage for Adair's injuries.

Here, ESI could have used October 19 as the "Start Date[,]" which then would have been the date on which its responsibilities under the statute began. However, it elected to use October 1 as the "Start Date" and paid Blood from that date. Presumably, it did so for its own pecuniary benefit. ESI's actions were part of the terms of the leasing arrangement between ESI and Jenkins, which, in turn, triggered the regulatory provisions of ORS 656.850. Once the provisions of the statute were triggered, ESI had to either satisfy the responsibilities of a WLC under the statute or exempt itself from the regulatory provisions of the statute by documenting Blood's status as a temporary worker as of October 1. In other words, ESI's own actions brought it within the regulatory scope of the statute as of October 1. As discussed, nothing in the statute precludes that result. Thus, ESI was responsible for providing workers' compensation coverage for all of Jenkins's subject workers as of October 1, 2007 (unless, as discussed below, ESI exempted itself from the definition of a WLC because it provided workers only on a temporary basis). ESI cannot avoid responsibility under the statute when its own election has placed it within the regulatory scope of the statute.

Nonetheless, SAIF argues that the "contemporaneous written documentation" requirement in the rule contemplates that the documentation be contemporaneous with when the leased worker is actually sent out to work for the client and not contemporaneous with an injury to a subject worker. But the interpretation advanced by SAIF would frustrate the legislative purpose of the statute to require companies to provide coverage for leased and subject workers. Under its interpretation, ESI could escape its responsibility under the statute from October 1 to October 19 even though it expressly assumed that responsibility for that time period and even though there was no documentation in existence at that time stating that Blood was a temporary worker. We do not believe that the legislature would have contemplated the result advanced by SAIF in light of

the policy of the statute. Moreover, the ALJ's interpretation of the rule is consistent with the legislative history of the statute and the intent of the statute and the rule to place the procedural burden on companies providing workers to either assume responsibility for coverage under the statute or to document their exempt status by declaring the worker to be a "temporary worker" under the statute as of the *date* of assumption of responsibility. In light of the legislature's intent to provide workers' compensation insurance coverage for leased and subject workers at any point in time during the course of a leased worker's employment, we conclude that the ALJ correctly ruled that SAIF, as ESI's insurer, is responsible for Adair's injuries.

We next address Jenkins's cross-petition. As noted, Jenkins advances two assignments of error: first, that the ALJ erred in ordering that Jenkins pay an assessed attorney fee to Adair's counsel pursuant to ORS 656.382(2) and, second, that the ALJ erred in denying Jenkins's request for attorney fees to be paid by SAIF pursuant to ORS 656.740(6)(b).[4] We first address the issue of preservation under ORAP 5.45(1). We observe that the award of fees to Adair was not preceded by any request for fees by Adair. As a consequence, Jenkins had "no practical ability to raise [the] issue" before the ALJ. *See Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008) ("In some circumstances, the preservation requirement gives way entirely, as when a party has no practical ability to raise an issue."). In other words, Jenkins was not required to take affirmative action to preserve error that first arose when the agency issued its order. *See, e.g., State v. Selmer*, 231 Or App 31, 34, 217 P3d 1092 (2009), *rev den*, 347 Or 608 (2010) (preservation requirement does not apply where "the error arose *when the court issued its order or judgment, and not earlier*" (emphasis added)).

---

[4] ORS 656.382(2) provides, in pertinent part:

"If a request for hearing * * * is initiated by an employer or insurer, and the Administrative Law Judge * * * finds that the compensation awarded to a claimant should not be disallowed or reduced, * * * the employer or insurer shall be required to pay to the attorney of the claimant a reasonable attorney fee in an amount set by the Administrative Law Judge * * *."

That statute was amended subsequent to the events that gave rise to this case. Or Laws 2009, ch 526, § 3. We refer to the current version, as that amendment has no bearing on our analysis.

Turning to the merits, both Jenkins and DCBS argue that ORS 656.382(2) is inapplicable under the circumstances of this case because Jenkins requested the hearing before the ALJ only to contest the NCE Order and not to dispute Adair's entitlement to compensation. They point out that ORS 656.382(2) concerns "compensation awarded to a claimant" and therefore necessarily is applicable only in proceedings where review is sought of an award of compensation. Here, neither the subjectivity nor the coverage issues raised at the hearing in this case contested an award of compensation to Adair. *Cf. Lankford v. Copeland,* 141 Or App 138, 142-43, 917 P2d 55 (1996), *overruled in part by Oldham v. Plumlee,* 151 Or App 402, 950 P2d 918 (1997) (a matter concerns a claim where "'a worker's right to receive compensation, or the amount thereof, are directly in issue'" (quoting ORS 656.704(3))). We therefore conclude that the ALJ erred in awarding attorney fees to Adair under ORS 656.382(2).

Finally, we turn to Jenkins's contention that the ALJ erred in refusing to award attorney fees to him and against SAIF pursuant to ORS 656.740(6)(b).[5] Jenkins argues that he prevailed on the issue of coverage before the ALJ and that, because no guaranty contract was filed by SAIF with DCBS, he was entitled to an award of attorney fees under the statute. But ORS 656.740(6)(b) requires an employer to prove coverage pursuant to ORS 656.740(3) as a predicate to an award of attorney fees under subsection (6) of the statute. Subsection (3) provides that, when an employer is alleged to have contracted with an insurer to provide the employer with workers' compensation coverage "for the period in question," the insurer shall be joined as a necessary party to any hearing regarding the employer's alleged noncompliance. When the subsections of the statute are read together, they contemplate the existence of a contract between an employer and an insurer for the insurer to provide coverage on behalf of the employer. Based on the

---

[5] ORS 656.740(6)(b) provides:

"If a person against whom an order is issued is found to be a noncomplying employer by the director, but the person proves coverage pursuant to subsection (3) of this section and the insurer failed to file timely proof of coverage as required by ORS 656.419 or improperly canceled the person's coverage, the employer is entitled to reasonable attorney fees paid by the insurer."

existence of such a contract, the insurer is then obligated to file proof of coverage with DCBS. ORS 656.419(2)(a). A breach of such a contractual obligation could result in an entitlement to attorney fees under ORS 656.740(6)(b). However, the ALJ found that Jenkins admitted that "he knew he needed insurance for employees on the site and that he had made a mistake by not having it." Consequently, because he is unable to demonstrate that he contracted with ESI and SAIF for SAIF to file a guaranty contract with DCBS on his behalf, Jenkins is not entitled to attorney fees under ORS 656.740(6)(b).[6]

On petition affirmed. On cross-petition, award of attorney fees against Jenkins and on behalf of Adair reversed; otherwise affirmed.

**SERCOMBE, J.,** concurring in part, dissenting in part.

The majority concludes that the October 19, 2007, work order obligated ESI to provide workers' compensation coverage for Jenkins's workers. It reasons that the work order created or modified a worker leasing contract between ESI and Jenkins and that ESI was obligated under the terms of that contract to provide Blood to Jenkins and to provide coverage beginning October 1, 2007. The majority infers a contractual promise to provide coverage solely because the work order issued by ESI for Blood noted a "Start Date" of October 1. The majority assumes that all provisions in that work order were part of a contract between ESI and Jenkins. It then reasons that ESI obligated itself in that contract to provide Blood to Jenkins as of October 1 and by that obligation *contractually agreed to provide workers' compensation coverage* beginning on that same date. The majority concludes that that contractual promise of coverage was not precluded by ORS 656.850 and was enforceable in the underlying noncompliance proceeding in order to excuse Jenkins's failure to provide coverage.

In my view, the majority answers a question of its own making that is beside the point. The issue in this

---

[6] Under the facts of this case, there was no contract between ESI and Jenkins for ESI and its insurer to provide coverage for Blood and Adair. Rather, ESI attempted to exempt itself from having to provide coverage by attempting to classify Blood as a temporary worker.

proceeding is not whether ESI promised Jenkins that it would insure Jenkins's workers and whether ORS 656.850 inhibits the enforcement of that promise. Instead, the question presented is one of statutory liability under a narrow set of facts—whether ORS 656.850(3) obligated ESI to provide coverage beginning October 1 because its work order "provide[d]" Blood to Jenkins on October 1. That question, in turn, gives rise to an issue of statutory construction as discussed below. I conclude that a worker is not "provide[d]" to an employer under ORS 656.850(3) until the worker is engaged to provide services and made available for employment. The work order could not have created that effect until October 19, 2007—the date that it engaged Blood to provide services to Jenkins. Therefore, I dissent from the majority's conclusion that the work order obligated ESI to provide coverage earlier.

ORS 656.850 imposes a number of obligations "[w]hen a worker leasing company provides workers to a client[.]" A "'Worker Leasing Company' [(WLC)] means a person who provides workers, by contract and for a fee, to work for a client but does not include a person who provides workers to a client on a temporary basis." ORS 656.850(1)(a). A "worker," in turn, is a "person * * * who engages to furnish services for a remuneration, subject to the direction and control of an employer * * *." ORS 656.005(30). Under ORS 656.850, "[w]hen a worker leasing company provides workers [*i.e.*, persons who have been engaged to furnish services] to a client," the worker leasing company must:

> 1.  "[S]atisfy the requirements of ORS 656.017 and 656.407 and provide workers' compensation coverage for those workers and any subject workers employed by the client[,]" ORS 656.850(3);

> 2.  "[A]ssure that the client provides adequate training, supervision and instruction for those workers to meet the requirements of ORS chapter 654[,]" ORS 656.850(4); and

> 3.  "[N]otify the director * * * in such manner as the director may prescribe[,]" ORS 656.850(5).

This case concerns whether ESI incurred those statutory obligations on October 1 because it purportedly "provide[d]" Blood to Jenkins on that date by issuing the October 19 work order with a "Start Date" of October 1 and a "Disp[atch] Date" of October 19. In the order under review, the administrative law judge (ALJ) concluded that "ESI provided Mr. Blood to Mr. Jenkins as a leased worker * * * from the starting date of that arrangement," that is, on October 1. Thus, the question presented is whether Blood was provided under the work order at the time of the written "Start Date" specification or whether he was provided when the order issued and he was engaged by ESI to furnish services to Jenkins.

The majority concludes that Blood was provided on October 1; however, its reasoning in reaching that conclusion is not clear. It notes that the ordinary meaning of "provides" is to "furnish" or "supply." 257 Or App at 55. The majority explains that the term "provides" is used in ORS 656.850 "without any express temporal connotations" and could be "where a worker is made 'available' by the WLC to the client for the client's use[,]" which need not be when the worker "actually begin[s] work for the client or [is] paid by the WLC on behalf of the client[.]" *Id.* at 56.

The majority then seems to conclude that, whatever the meaning of the statutory term "provides" might be, ESI could have contracted with Jenkins to provide workers and coverage at any time stated in the agreement, and that contract would not be limited by ORS 656.850 "so long as there is coverage in place when the leased worker begins work for the client." *Id.* at 56. Because there is nothing in ORS 656.850 or its legislative history to suggest "that the legislature intended to prohibit a WLC from voluntarily assuming its responsibilities under the statute as of a date that precedes the date that the worker actually reports for work[,]" *id.* at 57, the majority implicitly concludes that that is what happened here, *i.e.*, that ESI voluntarily contracted with Jenkins and assumed a coverage obligation by issuing a work order with a "Start Date" to compensate Blood as of October 1.

The majority does not explain how a provision to start compensation on a particular date, even if it were part of a contract between ESI and Jenkins, becomes a promise to provide workers' compensation coverage to Jenkins's workers. That is not what "Start Date: 10/01/2007" expressly states, nor what it could reasonably be said to imply. Indeed, the majority somewhat inconsistently concludes that, "[u]nder the facts of this case, there was no contract between ESI and Jenkins for ESI and its insurer to provide coverage for Blood and Adair." *Id.* at 62 n 6.

The issue in this proceeding, in my view, is not whether ESI contractually agreed to provide coverage to Jenkins's workers effective October 1. Instead, it is whether the issuance of the October 19 work order to Blood "provide[d]" him to Jenkins as of October 1 so as to make ESI accountable for the provision of coverage under ORS 656.850(3) on that date. I turn to that issue—an issue of statutory construction regarding the meaning of the term "provides" in ORS 656.850.

In construing a statute—here, ORS 656.850(3)—we examine the text of the statute in context, along with any relevant legislative history, in order to discern and give effect to the legislature's intent. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (setting forth interpretive methodology). With respect to OAR 436-050-0420, "[i]n interpreting administrative rules, we apply the same principles of interpretation that are used to construe statutes." *Haskins v. Palmateer*, 186 Or App 159, 166, 63 P3d 31, *rev den*, 335 Or 510 (2003).

As petitioners point out, the verb "to provide" is stated, in both the statute and the rule, in the present tense. ORS 656.850(3) states that, "[*w*]*hen* a worker leasing company *provides* workers to a client, [it shall satisfy various requirements, namely providing workers' compensation coverage for all of the client's subject workers]." (Emphases added.) Similarly, OAR 436-050-0420(1) states that

"[*a*] *person who provides* a worker *to work* for a client will be considered to be providing the worker on a 'temporary basis' only if there *is* contemporaneous written documentation, retained by either the client or the temporary

> service provider, which indicates the duration of the work *to be performed* and the worker *is provided* pursuant to ORS 656.850(1)(b), under one or more [subsequently enumerated] conditions[.]"

(Emphases added.) Petitioners persuasively argue that, pursuant to the rule's text, "there is 'a person' who 'provides' a worker to a client. The tense is active and present; it is not passive. It requires some action on the part of 'a person,' here, ESI. ESI only took action to provide Mr. Blood to Mr. Jenkins on October 19, 2007 * * *."

That argument is well taken. We give terms of common usage their "plain, natural, and ordinary meaning[,]" *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993), and generally assume that the legislature intended that statutes be construed in accordance with settled rules of grammar and syntax. *See, e.g.*, *Cuff v. Department of Public Safety Standards*, 345 Or 462, 470, 198 P3d 931 (2008) (construing statute "[a]s a matter of simple grammar" in that "the key phrases of [the statute's] provisions are worded in the present tense"); *V. L. Y. v. Board of Parole*, 338 Or 44, 50-51, 106 P3d 145 (2005) (verb tense dispositive in construing statute). As noted, "provides" is the present-tense form of the active verb "to provide." Above all, ORS 656.850(3) applies only "[w]*hen* a worker leasing company *provides* workers to a client[.]" (Emphases added.) Here, contrary to the ALJ's determination and irrespective of the documentation created later, that predicate "action" did not occur until October 19, 2007—nine days after Adair's injury.

Moreover, the context in which the term "provides" appears in the statute reinforces my conclusion regarding the text and its implications. Again, ORS 656.850(3) states, in part, that,

> "[w]*hen* a worker leasing company *provides* workers to a client, the worker leasing company *shall satisfy the requirements of ORS 656.017 and 656.407 and provide workers' compensation coverage for those workers and any subject workers employed by the client * * *."

(Emphases added.) Thus, in addition to its use of the present-tense term "provides," ORS 656.850(3) states that a worker

leasing company must satisfy specific requirements and take specific actions "[w]hen [it] provides workers to a client[.]" Nothing in the statute indicates that those obligations may be fulfilled retroactively. For instance, in this case, ESI—by virtue of Blood's appearance on October 19 rather than October 1—simply could not have complied with ORS 656.850(3). That is, it would have been impossible for ESI to actively "provide workers' compensation coverage" for Blood and Adair *on* October 1; it was entirely unaware of Blood's work for Jenkins, let alone Adair's existence, on that date. Only on October 19, when ESI completed the work order and provided Blood to Jenkins, could ESI have conceivably identified Adair as Jenkins's subject worker and complied with the statute by providing workers' compensation coverage for him. Contrary to the ALJ's conclusion, to hold otherwise in this instance would directly contravene the unambiguous language in ORS 656.850(3)—rendering the requirements that attach "[w]hen" a company such as ESI provides a worker to a client achievable only in hindsight.

Subsection (4) of ORS 656.850, immediately following the text at issue, gives rise to a similar point—once again indicating that the legislature did not intend to permit retroactive provision of leased workers. Subsection (4) states that, "[w]hen a worker leasing company provides workers for a client, the worker leasing company shall assure that the client provides adequate training, supervision and instruction for those workers to meet the requirements of ORS chapter 654 [concerning occupational health and safety]." Just as it would be impossible for a worker leasing company to "provide workers' compensation coverage" for unknown subject workers 19 days before learning of that obligation, it would likewise be impossible for a company to ensure that a worker receives adequate health and safety training before the time that the need for that training is established.

A person can only be provided as a "worker" under ORS 656.850 if, at the time of the provision, that person is in fact a "worker." As noted, "[w]orker" is defined by ORS 656.005(30) as a person who "engages to furnish services for a remuneration[.]" Blood was not engaged to furnish services

for ESI until October 19, and was neither a "worker" nor "provide[d]" until that date.

The text of OAR 436-050-0420 provides similar support. The rule states that a person must provide a worker "to work" for a client; that language suggests that ESI could not have provided Blood to Jenkins prior to October 19, 2007. "[T]o work" is an active verb phrased in the future tense, indicating that the requirements set forth in ORS 656.850(3) and OAR 436-050-0420(1) apply only upon the active provision of one or more workers for the purpose of completing work *in the future*. That construction is further supported by the requirement that documentation accompanying the provision of a worker indicate "the duration of the work *to be performed*." OAR 936-050-0420(1) (emphasis added). Here, even if—for the sake of argument—Blood was retroactively provided to Jenkins on October 1 within the meaning of ORS 656.850(3) and OAR 436-050-0420, he was provided only to be paid—not "to work." That is, the only thing that ESI affirmatively did with respect to Blood prior to October 19 (*i.e.*, on October 1 when the ALJ found that "ESI provided Mr. Blood to Mr. Jenkins") was to pay him. It was not until October 19, when ESI drafted the work order dispatching Blood "to work" for Jenkins, that ESI provided Jenkins with a "worker"—leased, temporary, or otherwise— in order to attend to any "work to be performed."

In sum, the language, grammatical structure, and context of both provisions at issue indicate that the legislature and the director, respectively, intended that the scheme for distinguishing between leased and temporary workers established by ORS 656.850 and OAR 436-050-0420 apply only as of the time that a worker—whether leased or temporary—is affirmatively provided to a client. As set forth above, that is the only tenable reading of ORS 656.850 and OAR 436-050-0420. *See Brock v. State Farm Mutual Auto. Ins. Co.*, 195 Or App 519, 526, 98 P3d 759 (2004) ("[W]e do not construe statutes in a manner that is grammatically untenable."). Accordingly, as noted, I conclude that ESI did not "provide" Blood to Jenkins as a worker, whether temporary or leased, until October 19, 2007—after Adair's October 10 injury. ESI was therefore not responsible for coverage of

Adair's injury claim, and the ALJ erred in concluding otherwise.

I concur in the majority's disposition of Jenkins's first assignment of error on cross-petition; however, I would not reach the issue regarding Jenkins's request for attorney fees given my disposition of the petition for review.